**UNITED STATES, Appellee,**

v.

**Glenn E. JORDAN, Airman, U. S. Air Force, Appellant.**

**No. 29,592.**

U. S. Court of Military Appeals.

Aug. 22, 1975.

---

2. *United States v. Marymont,* 11 U.S.C.M.A. 745, 751, 29 C.M.R. 561, 567 (1960) (citations omitted).

*Captain Bruce R. Houston* argued the cause for Appellant, Accused. With him on the brief was *Colonel William E. Cordingly.*

*Captain Alvin E. Schlechter* argued the cause for Appellee, United States. With him on the brief was *Colonel C. F. Bennett.*

## OPINION OF THE COURT

FLETCHER, Chief Judge:

The issues in this case concern the admissibility of the fruits of a search and seizure and of statements made by the accused when confronted with the results of the search. The Government maintains the search was legal because it was done with the freely obtained consent of the accused and that, in any event, the search was conducted solely by British police officers in connection with a British police investigation. The accused, on the other hand, contends he did not consent to the search but merely acquiesced in a police assertion of authority and that, as a matter of fact, the search was a joint venture executed by American and British officers to which our constitutional standards should be applied. We refer to the evidence in order to place the contentions of the respective parties in context.

Several burglaries had occurred in off-base, British-owned housing occupied by American service personnel in Bicester, England. Detective Sergeant Anthony Miller of the local police was in charge of the investigation. He received information which led him to believe that a black and white automobile with a noisy exhaust was involved. On April 18, 1974, he observed such a vehicle driving in the housing area in which the burglaries occurred. It was operated by the accused. Sergeant Miller stopped the vehicle and questioned the accused. He then looked into the vehicle and observed a rock and a black glove. Miller cautioned the accused and took him into custody.

Miller interrogated the accused at the Bicester police station and determined that he lived at the hospital on the air base. He told the accused that he intended to search his room and asked if he had any objection. The accused replied that there was nothing there, and Miller "asked him if he minded if I went and had a look." Accused requested permission to make a telephone call. As accused would not state to whom the call would be made, Miller refused to permit him to do so. Miller again asked accused "if I could look in his room and he replied, 'Yes, I can't really stop you.'"

Detective Sergeant Miller secured the accused's keys and, accompanied by Constable Leadbetter, proceeded to the air base. There, he went to the air police office "out of courtesy, to let them know that I was conducting an inquiry; that I wished to search a particular room." Sergeant Hanson and Sergeant Hoard of the air police accompanied the British officers to the accused's room.

There, the accused's belongings were searched. According to Miller, the air police took no part in the search other than to unlock a padlock on the accused's locker and to look around the room.

According to the accused, Miller stated it was his intention to search his room and "asked my permission." Miller refused to allow the accused to make a telephone call and told the accused "it would be easier if I

went ahead and gave my consent; if not, he could get a warrant." Accused replied that "there was nothing I could do." At no time did he convey the impression that he agreed to the search.

The search disclosed the presence of property stolen from the burglarized premises. It was photographed by an Air Force photographer summoned at Miller's request and turned over to the British officers. Miller returned to the local police station and, confronting the accused with the seized items, obtained a statement from him.

■ From the foregoing, it is obvious that there was no real consent on the part of the accused to the search of his room. Both his testimony and that of Detective Sergeant Miller establishes that he, then in custody, replied to the requests for permission to search with nothing more than a statement that he was powerless to prevent it. This was no more than acquiescence to police authority. As we stated in *United States v. Decker,* 16 U.S.C.M.A. 397, 401, 37 C.M.R. 17, 21 (1966):

> Consent to a search is not presumed. It must be proved by the Government "by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied." . . . Special caution is required when the consent is obtained from a person in police custody. *United States v. Justice,* 13 U.S.C.M.A. 31, 34, 32 C.M.R. 31.

Not even the police were able to state that the accused agreed to the search. Miller's own testimony establishes only that the accused stated, "I can't really stop you." This is hardly the free and voluntary consent required. *United States v. Vasquez,* 22 U.S.C.M.A. 492, 47 C.M.R. 793 (1973); *United States v. Watkins,* 22 U.S.C.M.A. 270, 46 C.M.R. 270 (1973). Accordingly, if the search is to be governed by American constitutional standards, we must of necessity find that it was not consensual and that its fruits, including the accused's subsequent statement, should not have been received in evidence.

This is the real problem presented. The Government basically urges that the search in this case was purely a British search and, under our decision in *United States v. DeLeo*, 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954), it matters not whether it complied with the Fourth Amendment. The accused rejoins that *DeLeo* is no more than an application of the "silver platter" doctrine to actions of foreign policemen and, as that principle was abandoned in *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) and *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), this Court should likewise no longer follow it.

*DeLeo* upheld a search by French officers in which there was a substantial degree of American participation. Judge Brosman, writing for the majority, upheld the reception in evidence of items seized during that search for a number of reasons. The underlying philosophical consideration which led the Court to its conclusion, however, was the desirability of having American personnel participate in foreign searches in order to protect the rights of the accused and to implement our treaty obligation to assist host nations "in the carrying out of all necessary investigations into offences, and in the collection and production of evidence." [1]

■ Competing with these considerations is the no less important doctrine that the Constitution of the United States applies to the exercise of federal power over a United States citizen wherever he may be located. Some federal courts have held that the Constitution's exclusionary rule need not be applied when evidence is seized by foreign police, at least when there is no American participation. *Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969); *Birdsell v. United States*, 346 F.2d 775 (5th Cir. 1965); *Johnson v. United States*, 207 F.2d 314 (5th Cir. 1953). Indeed, this Court so held on the basis that

the exclusionary rule is designed to deter wrongful activity by the United States Government. *United States v. Seiber*, 12 U.S.C.M.A. 520, 31 C.M.R. 106 (1961). But even the leading federal case distinguishes those situations in which "the United States itself was acting abroad, as a result of military occupation or treaty, their reasoning . . . [being] that the United States is bound by the Bill of Rights wherever it acts." [2]

The difficulty with these opinions, and particularly those of this Court, is that at the time of the decision in *DeLeo*, the exclusionary rule was, as noted in *Seiber*, no more than an evidentiary device designed to require federal officers to adhere to the command of the Fourth Amendment. It could have been altered by statute or, in the military, perhaps by amendment of the Manual for Courts-Martial then in effect. *See Wolf v. Colorado*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949). But with the subsequent decision in *Mapp v. Ohio, supra*, this was no longer the case. What had been a mere evidentiary device became a positive command of the Constitution, *i. e.*, that no evidence be admitted that was not seized in compliance with the Amendment's conditions.

■ It is true, of course, that this Court has no authority to infringe upon the sovereignty of another nation by attempting to impose American constitutional standards on their legitimate methods of securing evidence. It is likewise true that our treaties—part of the "supreme law of the land"—impose the duty on military authorities us well as those of the receiving state to assist in the investigation of offenses. From the foreign police standpoint, these investigations presumably would be done in compliance with local law for the purpose of any prosecutions. From the military standpoint, we see nothing burdensome in also requiring for American prosecutions

---

1. Article VII, section 6(a), Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces, June 19, 1951, [1953] 2 UST 1792, TIAS No. 2846; *United States v. DeLeo, supra* at 156–57, 17 C.M.R. at 156–57.

2. *Birdsell v. United States*, 346 F.2d 775, 782 (5th Cir. 1965).

that the military authorities comply with our constitutional standards. This is a measure we believe not only required by the Fourth Amendment in order to make evidence admissible in a Federal prosecution, but also one which will enhance protection of the accused's rights in a foreign milieu far better than the holding in *DeLeo*.

■ In sum, then, we hold that evidence obtained by search and seizure in a foreign country must meet Fourth Amendment standards in order to be admitted in evidence in a trial by court-martial, regardless of whether it is obtained by foreign police acting on their own or in conjunction with American authorities. The extent of an American's constitutional protections in an American court should not be lessened or removed by virtue of the fact that he is ordered to an overseas post for service. It is American judicial power that is being exerted against him and in such a case, it is by American constitutional standards that he should be judged. To the extent that *United States v. DeLeo, supra,* and similar cases are inconsistent with our holding in this case, they are hereby overruled.

As the evidence was seized in this case without the accused's freely given consent and as his statements were the fruit of that illegal search, reversal must necessarily follow.

The decision of the U.S. Air Force Court of Military Review is reversed and the record of trial is returned to the Judge Advocate General of the United States Air Force. As the record reveals no admissible substitute for the excluded evidence, the charges are ordered dismissed.

Senior Judge FERGUSON concurs.

COOK, Judge (dissenting):

To say that our armed forces carry with them the Constitution as well as the flag is one thing. To say that the Constitution operates against a foreign government in its own country is quite another; and, in my opinion, quite wrong. Yet, that is what the majority hold in saying that the evidence in issue was inadmissible because the exclusionary rule is "a positive command of the Constitution."

The exclusionary rule is indeed a part of the constitutional protection against unreasonable search and seizure, but the exclusionary rule does not forbid either the United States or a state from using evidence obtained by persons unconnected with the Federal or a State Government and acting without the participation of agents of either government. That is settled constitutional doctrine, and the majority's repudiation of it is, in my opinion, unjustified and unsound.

It has always been the constitutional rule that rights accorded individuals in the Bill of Rights are protections against actions by the Federal Government, not actions by State officials [3] or private persons.[4] Since adoption of the Fourteenth Amendment, a number, but not all, of the protections enumerated in the Bill of Rights have been recognized as part of the "due process" a state must accord every person subject to its authority when it seeks to deprive him of his "life, liberty, or property." In time, the individual's protection against unreasonable search and seizure by Federal agents, assured by the Fourth Amendment, was deemed a "due process" right of the individual secured against State action by the Fourteenth Amendment. As a result, evidence obtained by unreasonable search and seizure, by either Federal or State agents, is evidence obtained in violation of the Constitution. But, the Constitution's prohibitions apply only to Federal and State action, and the sanction of the exclusionary rule applies only to evidence obtained by such governments.

Four years ago, the United States Supreme Court reaffirmed that evidence improperly taken from an accused by a private person, without government participa-

---

**3.** *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972); *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**4.** *Coolidge v. New Hampshire,* 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

tion, is not subject to the exclusionary rule. In *Coolidge v. New Hampshire*, 403 U.S. 443, 485, 489, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), two police officers went to defendant's home and spoke to his wife. The defendant was then suspected of murder and was undergoing police interrogation at another place. As a result of the conversation with the officers, the defendant's wife gave them several guns and some clothing that belonged to the defendant. At the trial, the defendant contended these articles were obtained in violation of his constitutional right against unreasonable search and seizure. The Court rejected the contention, saying:[5]

> Had Mrs. Coolidge, wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence. . .
>
> The question presented here is whether the conduct of the police officers at the Coolidge house was such us to make her actions their actions for purposes of the Fourth and Fourteenth Amendments and their attendant exclusionary rules. The test, as the petitioner's argument suggests, is whether Mrs. Coolidge, in light of all the circumstances of the case, must be regarded as having acted as an "instrument" or agent of the state when she produced her husband's belongings.
>
> . . . The exclusionary rules were fashioned "to prevent, not to repair," and their target is official misconduct. They are "to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." . . . But it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals. If, then, the exclusionary rule is properly applicable to the evidence taken

from the Coolidge house on the night of February 2, it must be upon the basis that some type of unconstitutional police conduct occurred.

During its last term, the Supreme Court again emphasized that the exclusionary rule was not intended "to redress the injury to the privacy of the search victim," but to deter "unlawful police conduct," that is "governmental intrusions." *United States v. Calandra*, 414 U.S. 338, 347, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974). As the Court of Appeals for the Ninth Circuit has said: "If the search was private, the Fourth Amendment does not apply." *United States v. Ogden*, 485 F.2d 536, 538 (9th Cir. 1973).

What is true of action by a private person is equally true of action by a foreign government. It bears repeating that the Fourth Amendment protects only against action by the Federal Government, and the Fourteenth Amendment protects only against action by a State of the United States. A foreign government, like a private person, is just not subject to these provisions. As we recently observed, "the provisions of the Constitution of the United States are not binding upon . . . [foreign] officials in the performance of their respective functions as defined by the laws" of their country. *Autry v. Hyde*, 19 U.S.C. M.A. 433, 436, 42 C.M.R. 35, 38 (1970). It follows that since the constitutional provision as to unreasonable search and seizure does not apply to a foreign government, the exclusionary rule, whose very existence depends upon the constitutional provision, does not apply. Unless there is evidence of impermissible participation by American agents, evidence obtained by foreign police in a search conducted in their country pursuant to their law is not excludable from evidence in an American court because the search did not meet American constitutional standards.[6]

---

5. *Id.* at 487–88, 91 S.Ct. at 2048.

6. *Meister v. Commissioner of Internal Revenue*, 504 F.2d 505 (3rd Cir. 1974); *United States v. Tierney*, 448 F.2d 37 (9th Cir. 1971); *United* *States v. Callaway*, 446 F.2d 753 (3rd Cir. 1971); *Stonehill v. United States*, 405 F.2d 738 (9th Cir. 1968).

Nothing in the majority opinion convinces me that the settled limitation on the exclusionary rule is wrong constitutional doctrine. Accordingly, I adhere to it. Further, I would not overrule *United States v. DeLeo,* 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954), for reasons given by the majority. It may be, as was indicated in *United States v. Schnell,*[7] that the evidentiary rule provided in the Manual for Courts-Martial, United States, 1969 (Rev.), has replaced the *DeLeo* perception of the amount of participation by American agents in a foreign search that will make the search subject to our constitutional standards, but I need not reach that question. I am satisfied from the evidence of record that what was done by American agents in this case did not constitute disqualifying participation. Accordingly I would affirm the decision of the Court of Military Review.

*Colonel Victor A. DeFiori, Lieutenant Colonel James Kucera,* and *Captain Donald R. Jensen* were on the pleadings for Appellant, Accused.

*Lieutenant Colonel Ronald M. Holdaway, Lieutenant Colonel Donald W. Hansen,* and *Captain Raymond Michael Ripple* were on the pleadings for Appellee, United States.

---

7. 23 U.S.C.M.A. 464, 50 C.M.R. 483 (1975).